IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE GLUCAGON-LIKE PEPTIDE-1 | : | MDL NO. 3163 |
| RECEPTOR AGONISTS (GLP-1 RAS) | : | |
| NON-ARTERITIC ISCHEMIC | : | THIS DOCUMENT RELATES TO ALL |
| OPTIC NEUROPATHY | : | CASES |
| PRODUCTS LIABILITY LITIGATION | : | |
| | : | JUDGE KAREN SPENCER MARSTON |

| | | |
|---|---|---|
| MICHAEL DILWORTH | : | COMPLAINT AND JURY DEMAND |
| Plaintiff | : | |
| v. | : | CIVIL ACTION NO.:_____ |
| | | |
| NOVO NORDISK A/S and | : | |
| NOVO NORDISK INC. | | |
| Defendants | : | |

CIVIL ACTION - COMPLAINT

Plaintiff files this Complaint pursuant to the Direct Filing Order and is to be bound by the rights, protections and privileges, and obligations of that Direct Filing Order and other Orders of the Court. Further, in accordance with the Direct Filing Order, Plaintiff hereby designates the United States District Court for the Eastern District of Pennsylvania as Plaintiff's designated venue ("Original Venue"). Plaintiff makes this selection based upon one (or more) of the following factors:

A. Plaintiff currently resides in Bridgeport, Pennsylvania (within the Eastern District of Pennsylvania);

B. Plaintiff purchased and used Defendant(s)' products in: King of Prussia, Pennsylvania and Bridgport, Pennsylvania respectively (both within the Eastern District of Pennsylvania);

C. The Original Venue is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, specifically (28 USC § 1391(b)(2)): Eastern District of Pennsylvania.

AND, COMES NOW, Plaintiff Michael Dilworth, by and through undersigned counsel, and brings this Civil Action against Novo Nordisk A/S  and Novo Nordisk Inc. (hereinafter sometimes "Defendants" or collectively "Novo Nordisk", for Strict Products Liability, Negligence, Negligent Failure to Warn, Breach of Warranties Express and Implied, Negligent Misrepresentation, Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law and Punitive Damages, resulting in damages suffered by  Michael Dilworth who was severely injured as a result of Defendants' product Ozempic, also known as Semaglutide, an injectable prescription drug medication, including through Defendants widespread marketing of Ozempic and Wegovy, and Plaintiff's subsequent use of Ozempic/Semaglutide, and sets forth as follows:

<u>JURISDICTION AND VENUE</u>

1.  Jurisdiction exists in this action under diversity of citizenship, 28 U.S.C. §1332, as the matter in controversy exceeds One Hundred and Fifty-Thousand Dollars ($150,000), exclusive of interest and costs and as Plaintiff is a citizen of the Commonwealth of Pennsylvania, and each Defendant is neither incorporated nor has its principal place of business in the Commonwealth of Pennsylvania.

2. Venue is appropriate in this Judicial District via 28 U.S.C. §1391 because substantial, material events, acts/omissions/commissions occurred within the Eastern District of Pennsylvania, including:  the marketing, prescription, and sale of Ozempic (also known as Semaglutide) to Plaintiff Michael Dilworth, and the injury to Plaintiff Michael Dilworth (who resides within the Eastern District of Pennsylvania); in addition, the Eastern District of Pennsylvania is the venue for MDL 3163 litigation.

3. This Court has personal jurisdiction over Defendants consistent with the United

States Constitution and 42 Pa. C.S. §5322 (Pennsylvania's "long arm" statute), as Plaintiff's claims arise out of Defendants' transaction of business, their tortious acts within the Commonwealth of Pennsylvania, their doing a series of similar acts for the purpose of thereby realizing pecuniary benefit, and by virtue of Defendants' substantial, continuous, and systematic contacts with the Commonwealth of Pennsylvania.

4. This Court has supplemental jurisdiction over the remaining common law and state law claims pursuant to 28 U.S.C. § 1367.

5. Venue is further proper under 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claim occurred in this District. Defendants routinely market their products at issue in this District, including here to Plaintiff Michael Dilworth and his prescribing Doctor, and conduct business in this District related to their products at issue in the Eastern District of Pennsylvania.

6. Novo Nordisk's additional contacts with Philadelphia, Pennsylvania include the following, which are related to the actions and transactions at issue in this complaint:

7. Novo Nordisk has retained U.S. private contract manufacturer PCI Pharma Services to handle assembly and packaging of its products, including putting together the self-injection pens used to administer its products; and, the self-injection pens are required for a patient to use the drug and potentially suffer adverse effects underlying this Complaint; and, PCI Pharma Services is headquartered in Philadelphia, PA.[1]

8. Novo Nordisk routinely recruits employees within Philadelphia related to diabetes care, and recruits sales associates in Pennsylvania; and, Novo Nordisk maintains employees in

---

[1] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html

Philadelphia related to diabetes care; and, the Philadelphia Department of Public Health released a report on "Drug Marketing Through Gifts of Meals to Physicians in Philadelphia," which showed Novo Nordisk's Ozempic was #8 in the "Top 20 Drugs Marketed in Philadelphia" in 2018 through February 2020.[2]

## THE PARTIES

9. At all times pertinent hereto, Plaintiff Michael Dilworth (hereinafter sometimes "Plaintiff") is an adult resident and citizen of the Commonwealth of Pennsylvania residing at 12 West 6th Street, Bridgeport, Pennsylvania 19405.

10. Novo Nordisk Inc. ("Novo Nordisk") is a Delaware corporation that has its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.

11. Defendant Novo Nordisk A/S is a public limited liability company organized under the laws of Denmark with a principal place of business in Bagsvaerd, Denmark.

12. Defendant Novo Nordisk A/S and its subsidiaries are collectively referred to as "the Novo Nordisk Defendants" and "Novo Nordisk".

## BACKGROUND AND INTRODUCTION

13. This is an action for damages suffered by Plaintiff, who was severely injured as a result of his prescribed use of Ozempic/Semaglutide, a GLP-1 receptor agonist ("GLP-1RA"), a prescription medication designed, researched, tested, manufactured, marketed, supplied, promoted, advertised, packaged, labeled, sold and/or distributed by Defendants.

14. Ozempic belongs to a class of drugs called GLP-1 receptor agonists ("GLP-1RAs"), and the active ingredient in Ozempic is known as Semaglutide, the same as Wegovy (both

---

[2] https://www.phila.gov/media/20200204150030/2020-drug-marketing-report_2_4_2020.pdf

Ozempic and Wegovy are Semaglutide and are both designed, researched, tested, manufactured, marketed, supplied promoted, advertised, packaged, labeled sold and/or distributed by Defendants).

15. Medications within the GLP-1RA class of drugs mimic the activities of physiologic GLP-1, a gut hormone that binds to receptors throughout the body and, notably, activates GLP-1 receptors in the pancreas to stimulate the release of insulin and suppress glucagon.

16. GLP-1 RAs are designed to work similarly, to stimulate insulin production and reduce glucose production, but engineered to last longer than naturally occurring GLP-1, which has a short life and is quickly metabolized by enzymes.

17. GLP-1 RAs are prescribed, for certain patient populations, to control blood sugar in adults with type 2 diabetes, reduce cardiac risk, and/or aid in chronic weight management.

18. Defendants have failed to provide adequate warnings about adverse events caused by their GLP-1RAs, even serious and devastating effects, including non-arteritic anterior ischemic optic neuropathy ("NAION"), which can result in blindness and permanent vision loss, as well as blurry and/or darkened vision, which may lead to falls and other injuries.

19. The decision to target the American population for the sale of Defendants' GLP1RAs was no6t accidental whereby Defendants understood the vast financial potential of marketing medications for weight loss in the United States, where obesity rates were on the rise despite the culture's obsession with losing weight and being thin.

20. Defendants set upon a course to create and expand the market for weight-loss medication(s) by, among other things, advocating for obesity to be classified as a disease and thereby expanding the market for their drugs, including Ozempic, spending hundreds of millions of dollars in an effort to change the medical consensus on how to treat obesity, implementing

invasive, unprecedented and multifaceted marketing campaigns that were so effective they engrained these drugs within pop culture, and spending untold millions in an effort to get weight-loss medications covered under public and private insurance.

21 Defendants engaged in such conduct even before GLP-1 RAs were approved for weight loss, encouraging extensive off-label demand for, and use of, GLP-1 RAs.

22. By undertaking that effort, Defendants also systematically and purposefully targeted users of other diabetes medications.

23. Defendants' promise of weight loss wrongfully enticed users of other diabetes/weight loss medications to switch to a GLP-1 RA who never would have done so had it not been for the off-label promotion of those drugs.

24. Defendants also sought to make the GLP-1 RAs more accessible by, among other things, marketing through telemedicine where the criteria for qualifying for the drugs, e.g., Body Mass Index ("BMI"), are more easily manipulated.

25. Defendants' efforts to conceal (or minimize) the risks associated with taking their drugs were intended to create the impression that these were "miracle drugs" to help users lose weight.

26. Defendants never disclosed that many people who take these drugs stop taking them because of the drastic side effects (thereby never achieving weight loss or any health benefit allegedly associated with the drug).

27. Defendants did not disclose: that these drugs do not result in meaningful weight loss for up to 15% of people; the average weight loss for someone taking the drugs is a modest 10.09% of the person's body weight; or that a person will need to stay on these drugs for the rest of their lives to maintain the weight loss.

28. The efforts to engrain GLP-1 RAs such as Ozempic in the public conscious, to manipulate the medical community's views on obesity treatment, and to make the drugs more accessible acted as a launching pad for the explosive growth of the GLP-1 RAs both for people with diabetes, and for people seeking to lose weight, whether they were using the drug as prescribed or off-label.

29. Plaintiff Michael Dilworth would not have taken Ozempic/Semaglutide if he had been provided a full and clear warning of the true risks of taking these drugs.

30. Defendants' efforts to expand and grow the market both for treatment of diabetes and weight-loss, whether off-label or not, worked whereby the U.S. GLP-1 RA market is expected to exceed $100 Billion by 2030 with total U.S. users comprising about 9% of the population.

31. Such growth is a tremendous profit to Defendants but comes at significant cost; and, financially, it is expected that Defendants' lobbying efforts will pay off, and GLP-1 RAs may get added to prescription drug coverage under Medicare Part D in the coming years, with some analysts projecting that this will add $13.6 to $26.8 Billion to Medicare Part D expenses even if only 10% of people with obesity use them, resulting in a significant shift in premiums and coverage in other areas.[3]

32. The growth of the market for GLP-1 RAs also means that the patient base has expanded to include many patients who would be better served choosing alternate treatment paths.

33. Defendants' marketing campaigns have altered the public understanding of weight loss treatment, creating the impression that GLP-1 RAs are not just one tool among many available to doctors, but are instead "miracle drugs."

---

[3] https://www.kff.org/medicare/what-could-new-anti-obesity-drugs-mean-for-medicare/

34. Patients, including Plaintiff, were lured into a false sense of hope that Ozempic would guarantee results and be efficacious and safe.

35. Plaintiff injected himself with Ozempic believing that he was doing something to promote his health when, in fact, it had the opposite effect.

36. As a direct and/or proximate result of his use of Ozempic, Plaintiff has suffered severe personal injuries which were directly and/or proximately caused by his regular and prolonged use of Ozempic, particularly sudden onset of NAION permanent vision loss and its sequelae, including vision disturbances, blurry and/or darkened vision leading to falls, disability, expected loss of his Commercial Driver's License and his truck-driving career, interference with activities of daily living, loss of life's enjoyment, emotional distress, economic losses, medical expenses, damages, among other injuries set forth more fully herein.

37. Plaintiff was prescribed and took Ozempic as directed by his medical provider.

38. The Novo Nordisk Defendants' website states that "the vast majority of our U.S. injectable diabetes and obesity products are produced and packaged at the Clayton aseptic fill finish site".

39. Thereby upon information and belief, this refers to Novo Nordisk's manufacturing facility in Clayton, North Carolina, operated by the Novo Nordisk Defendants.

40. Defendants Novo Nordisk A/S and Novo Nordisk Inc. are identified on Ozempic's label; and, Defendants also designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed Ozempic.

41. Defendants failed to warn physicians and the end users of Ozempic of the complications and devastating effects of which Defendants knew or should have known, including NAION, which can result in blindness and permanent vision loss.

42. Upon information and belief, Defendants failed to warn the end users of Ozempic of the complications and devastating effects of which the company knew or should have known.

43. Upon information and belief, Defendants' marketing was deceptive and misleading regarding the true risks associated with the use of Ozempic, risks which Defendants knew or should have known.

44. In the early 1990s, Novo Nordisk researchers discovered that when they injected into rats a chemical compound known as liraglutide—a GLP-1 (glucagon-like peptide-1) agonist—the drug caused the rats to stop eating almost entirely.[4]

45. GLP-1 agonists are a class of medications that can help lower blood sugar levels and promote weight loss.

46. An agonist is a manufactured substance that attaches to a cell receptor and causes the same action as the naturally occurring substance.17 Thus, GLP-1 agonists work by mimicking a naturally occurring GLP-1 hormone.[5]

47. GLP-1 medications bind to GLP receptors to trigger the effects (or roles) of the GLP-1 hormone, thereby the higher the dose of the GLP-1 agonist, the more extreme the effects. Id.

48. "These rats, they starved themselves," said one Novo Nordisk scientist, Lotte Bjerre Knudsen, in a video series released by the Novo Nordisk Foundation, "so we kind of knew there was something in some of these peptides that was really important for appetite regulation."[6]

49. Later testing in human subjects revealed that those who received an intravenous drip of GLP-1 agonist ate 12% less at a lunch buffet than those who got a placebo. Id.

---

[4] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html
[5] https://my.clevelandclinic.org/health/treatments/13901-glp-1-agonists
[6] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html

50. Thereby, Novo Nordisk decided to study liraglutide as not only a diabetes drug which had been shown to lower blood sugars, but also as a drug to treat obesity. Id.

51. In 2010, liraglutide was approved for the treatment of diabetes by the FDA under Novo Nordisk's brand name Victoza, whereby Novo Nordisk moved forward with studying the drug for weight loss.[7]

52. After clinical trials, in 2014, the FDA approved liraglutide as a daily injectable for treatment of obesity under Novo Nordisk's brand name, Saxenda. Id.

53. Saxenda's effects on weight loss, however, were modest where patients lost about an average of 5% of their weight.  Id.

54. In an effort to find ways to make a longer-lasting GLP-1 agonist so patients would not have to inject themselves every day, Novo Nordisk created a new molecule with the chemical name Semaglutide. Id.

55. Novo Nordisk branded Semaglutide as Ozempic, and on December 5, 2016, Defendants announced submission of Ozempic's new drug application (NDA) to the FDA for regulatory approval of a once-weekly injectable, in 0.5 mg or 1 mg doses, for treatment of Type 2 diabetes.

56. In said announcement, Defendants represented that in clinical trials "once-weekly" Ozempic had a safe and well-tolerated profile, and Defendant represented that the most common adverse event was nausea.[8]

57. On December 5, 2017, the FDA approved the Ozempic application and granted premarket approval as NDA 209637.[9]

---

[7] https://pmc.ncbi.nlm.nih.gov/articles/PMC2957743/
[8] https://ml.globenewswire.com/Resource/Download/d2f719e1-d69f-4918-ae7e-48fc6b731183
[9] https://www.accessdata.fda.gov/Ozempicatfda_docs/appletter/2017/209637s000ltr.

58. When Novo Nordisk announced that Defendants had started selling Ozempic in the United States, Defendants touted the medication as a "new treatment option" that "addresses the concerns and needs of people with diabetes[.]"

59. Novo Nordisk thereby offered an "Instant Savings Card to reduce copays to as low as $25 per prescription for up to two years."[10]

60. In addition to diabetic and/or glycemic control, Ozempic also caused 15% weight loss, which was three times the loss caused by its predecessor, Saxenda.[11]

61. One year after Ozempic's approval for diabetes, Defendants started a clinical trial in patients who were overweight or suffered from obesity. Id.

62. The results of the trial demonstrated that for participants who were overweight or obese, 2.4 mg of Semaglutide, once weekly, plus lifestyle intervention was associated with sustained, clinically relevant reduction in body weight.[12]

63. On March 20, 2019, Defendants submitted a supplemental new drug application (sNDA) for Ozempic 0.5 mg or 1 mg injection, requesting approval to expand its marketing of Ozempic by adding an indication to reduce the risk of major adverse cardiovascular events in adults with type 2 diabetes and established cardiovascular disease.[13]

64 On January 16, 2020, the FDA approved this new indication.[14]

---

[10] https://www.novocare.com/eligibility/diabetes-savings-card.html#:~:text=For%20commercially%20insured%20patients%20with,regulations%20as%20a%20pharmacy%20provider.

[11] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html

[12] https://www.nejm.org/doi/full/10.1056/NEJMoa2032183

[13] https://www.prnewswire.com/news-releases/novo-nordisk-files-for-us-fda-approval-of-oralsemaglutide-for-blood-sugar-control-and-cardiovascular-risk-reduction-in-adults-with-type-2-diabetes-300815668.html

[14] https://www.accessdata.fda.gov/Ozempicatfda_docs/appletter/2020/209637Orig1s003ltr.pdf

65. By March of 2021, Defendants had completed the clinical trial studying Semaglutide for weight loss, and its results were published March 18, 2021.[15]

66. In addition to the results, the published study, which was funded by Defendants, argued: "Obesity is a chronic disease and global public health challenge." Id.

67. On May 28, 2021, Defendants submitted another sNDA requesting approval for a higher, 2 mg dose of Ozempic injection.

68. On March 28, 2022, the FDA approved this request.[16]

69. In a press release, Defendants represented Ozempic as having "proven safety and efficacy" and Defendants continued to advertise that "it can help many patients lose some weight."[17]

70. As with its prior press releases, Defendant disclosed Important Safety Information and provided links to the Medication Guide and Prescribing Information. However, severe gastrointestinal events, including gastroparesis and gastroenteritis, were not identified as risks; and, there was not any disclosure about risks of vision loss, including NAION.

71. On September 22, 2023, Novo Nordisk added "ileus" under Section 6-3 Postmarketing Experience of the Prescribing Information ("PI" or "label") in a revised Ozempic label.

72. The new label listed ileus as an adverse reaction reported during post-approval use of Semaglutide, the active ingredient in Ozempic and Wegovy.[18]

---

[15] https://www.nejm.org/doi/full/10.1056/NEJMoa2032183

[16] https://www.accessdata.fda.gov/Ozempicatfda_docs/appletter/2022/209637Orig1s009ltr.pdf

[17] https://www.prnewswire.com/news-releases/novo-nordisk-receives-fda-approval-of-higherdose-ozempic-2-mg-providing-increased-glycemic-control-for-adults-with-type-2-diabetes-301512209.html

[18] Ozempic Label (dated 9/22/23), available at https://www.accessdata.fda.gov/drugsatfda__docs/label/2023/209637s0202s0211bl.pdf

73. On September 6, 2024, the FDA notified Novo Nordisk of new safety information that it determined should be included in the labeling for GLP-1 RAs pertaining to the risk of pulmonary aspiration during general anesthesia or deep sedation.

74. On October 4, 2024, Novo Nordisk submitted a supplemental new drug application (sNDA 209637/S-032) and amendments for Ozempic incorporating the FDA's required safety modifications to the label.

75. On November 1, 2024, the FDA provided supplemental approval for sNDA 209637/S-032.[19]

76. No version of the Ozempic label or Wegovy label has warned patients or their doctors that taking Ozempic may cause NAION or result in permanent vision loss.

77. Novo Nordisk was not permitted to market Ozempic for weight loss without FDA approval for that specific indication,[40] but before Ozempic ever received separate approval for treatment of wight loss, Novo Nordisk had already begun mentioning weight loss in its Ozempic commercials.[20]

78. On July 30, 2018, Novo Nordisk launched its first television ad for Ozempic to the tune of the 1970s hit pop song "Magic" by Pilot, wherein Novo Nordisk advertised that "adults lost on average up to 14 pounds" when taking Ozempic. Id.

79. Over the next five years, Novo Nordisk spent $884,000,000 running television ads in the United States to promote its semaglutides, Ozempic, Wegovy, and its lesser known GLP-1

---

[19] FDA Supplement Approval Letter for NDA 209637/S-032 (Ozempic), available at https://www.accessdatafda.gov/drugsatfda__docs/appletter/2024/209637Orig1s)32ltr.pdf
[20] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html

agonists, Rybelsus, with most advertisements allocated towards Ozempic.[21]

80. Defendants also employed sophisticated use of social media to market Ozempic.

81. On TikTok, the hashtag #Ozempic has had over 1.2 billion views, whereby Ozempic rose to "Tiktok stardom" (https://www.isms.org/newsroom-categories/patientresources/march-2-2023-how-ozempics-rise-to-tiktok-stardom-i#).

82. Novo Nordisk partnered directly with Meta and Instagram to run marketing campaigns.

83. One diabetes marketing campaign achieved a dramatic 28% direct engagement rate with their polls, this was a lauded result presented in a case study by Meta.[22]

84. On July 10, 2023, a global media company declared Ozempic as "2023's buzziest drug" and one of the "Hottest Brands, disrupting U.S. culture and industry."[23]

85. Ozempic ranked as the sixth most advertised prescription drug brand in 2022, with a U.S. measured media spend of $181 million, according to Vivvix spending data and Pathmatics paid social data as reported in Ad Age Leading National Advertisers 2023. Id.

86. In 2023, over $491 million was spent advertising "diabesity" drugs, including Ozempic and Wegovy.[24]

87. In the first nine months of 2025, Novo Nordisk reportedly spent an estimated $169 million on U.S. advertising for Ozempic, a 44% increase over the same period in 2024. [25]

88. Novo Nordisk has spent millions of dollars delivering their message to physicians,

---

[21] https://medwatch.com/News/Pharma___Biotech/article15680727.ece
[22] https://business.instagram.com/success/novo-nordisk
[23] https://adage.com/article/special-report-hottest-brands/ozempic-hottest-brands-most-popularmarketing-2023/2500571
[24] https://www.mmm-online.com/home/channel/spending-on-ozempic-wegovy-surges/
[25] https://www.reuters.com/business/media-telecom/novos-wegovy-ozempic-us-advertising-spend-doubles-rival-eli-lilly-data-shows-2026-01-28/

healthcare providers, and consumers; and, the FDA recognizes the fact that sophisticated marketing techniques influence physician prescribing behavior, including that:

> Research demonstrates that promotional communications about medical products often employ marketing techniques that are effective at influencing attitudes and behaviors of HCPs [Healthcare Providers], and that how information is presented can impact HCP impressions of that information. These marketing techniques can influence attitudes and behavior, independent of the quality of the information, even among highly educated medical professionals.[26]

89. For example, Novo Nordisk spent over $33,000,000 in 2022 on traditional physician marketing and detailing according to Open Payments Data.[27]

90. Novo Nordisk promoted the safety, efficacy, and sale of Ozempic in the United States on its websites, in press releases, through in-person presentations, through the drug's label, in print materials, on social media, advocacy groups, lobbying groups, celebrity partnerships, telehealth partnerships, key opinion leaders, and through other public outlets.

91. Throughout its marketing, Defendants have failed to disclose the true serious side effects of Ozempic, including but not limited to hospitalization and death.

92. As a result of Novo Nordisk's all-encompassing advertising and promotion efforts, Ozempic is widely prescribed throughout the United States.

93. As of August 10, 2023, Novo Nordisk reported that in the first six months of 2023 sales of Ozempic jumped 50% to more than $3.7 billion.[28]

94. In July of 2021, doctors in the US wrote 62,000 prescriptions a week for Ozempic.[29]

---

[26] U.S. FDA, *Communications From Firms to Health Care Providers Regarding Scientific Information on Unapproved Uses of Approved/Cleared Medical Products Questions and Answers: Draft Guidance for Industry*, at https://www.fda.gov/media/173172/download.
[27] https://openpaymentsdata.cms.gov/company/100000000144
[28] https://www.cnbc.com/2023/09/09/big-pharma-blockbuster-obesity-drug-battle-is-headed-for-100-billion.html
[29] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html

95. In June 2023, it was reported that new prescriptions for Ozempic had surged by 140 percent from the prior year. [30]

96. This surge has reshaped Denmark's economy as the country has reaped huge profits from the sale of the drug, which is now solely responsible for the country's economic growth.[31]

97. Ozempic had become so popular, that Novo Nordisk had at one point limited shipment to the US and paused advertising while addressing shortages.[32]

98. Upon information and belief, Defendants have long known that Ozempic is a powerful, dangerous drug.

99. Defendant knew from both pre-market and post-market research and analytics that Ozempic could cause malnutrition, cyclical vomiting, gastroparesis, gastroenteritis, intestinal obstruction/blockage, ileus, esophageal and bowel injury, DVT and associated pulmonary embolism, gallbladder problems necessitating surgery, and intraoperative aspiration.

100. Novo Nordisk has repeatedly failed/refused to warn about the known dangerous side effects of Ozempic.

101. Some doctors estimate that as many as 10% of patients discontinue use of these drugs due to the severity of side effects.[33]

102. Thousands of adverse event reports have been filed by the public with the FDA Adverse Event Reporting System.

---

[30] https://www.washingtonpost.com/business/2023/06/11/weight-loss-ozempic-wegovyinsurance/
[31] https://www.nytimes.com/2023/08/28/business/denmark-ozempicwegovy.
[32] https://www.theatlantic.com/health/archive/2023/05/ozempic-teen-obesity-treatment-healthpromises-risks/674204/

[33] https://www.cbsnews.com/news/ozempic-side-effects-weight-loss-drugs-wegovy-mounjarodoctors-warn/

103. As of June 2022, the FDA posted an alert that Ozempic has potential safety signals for intestinal blockage.[34]

104. On September 22, 2023, FDA updated the label for Ozempic to include "ileus," the medical term for blocked intestines.[35]

105. Wegovy, chemically identical to Ozempic, already carried a warning on ileus.

106. As early as 2014, Defendant knew that Saxenda (liraglutide), Ozempic's predecessor, caused serious side effects and warned the end user of same.[36]

107. As early as 2019, Defendant knew that Rybelsus (Semaglutide), Ozempic's predecessor, caused serious side effects and warned the end user of same.

INTRODUCTION TO PLAINTIFF'S INJURIES:  DEVELOPMENT OF NAION AND ITS SEQUELA

108 Non-arteritic anterior ischemic optic neuropathy (NAION) is a medical condition involving damage to the optic nerve causing sudden vision loss.

109. NAION is irreversible and permanent.

110. NAION falls within the category of an eye stroke.

111. NAION is untreatable and can lead to permanent blindness.

112. The general belief amongst the medical community is that NAION is caused by insufficient blood supply or ischemia to the optic nerve.

---

[34] https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-systemfaers/april-june-2022-potential-signals-serious-risksnew-safety-information-identified-fdaadverse-event

[35] https://www.accessdata.fda.gov/scripts/cder/safetylabelingchanges/index.cfm?event=searchdetail.page&DrugNameID=2183

[36] https://www.accessdata.fda.gov/drugsatfda_docs/label/2014/206321orig1s000lbl.pdf

113. "[T]ransient hypoperfusion of the short posterior ciliary arteries causes acute ischemia to the optic nerve head (ONH), resulting in axonal swelling. This swelling compromises the axoplasmic flow, which subsequently increases the axonal swelling, contributing to the compression of ONH microcirculation, exacerbating the ischemia."[37]

114. Typically, NAION patients present with acute, vision loss in the eye that is often described as blurry or cloudy while 8-12% of patients may have accompanying pain such as a headache or periocular pain.

115. The vision loss may occur over hours to days, but generally NAION patients notice vision loss or even total blindness upon waking in the morning.

116. After glaucoma, NAION is the second leading cause of blindness due to optic nerve damage.

117. Some NAION patients lose complete vision with no recovery in affected eye(s).

118. Reduced or loss of vision has a detrimental impact on a person's day-to-day life. Many NAION patients cannot drive or have driving restrictions, cannot read or have trouble reading, and may be unable to continue in their line of employment, whereby blindness/vision loss in one eye, and certainly both eyes, can result in difficulty walking particularly including when it involves moving from areas with changes in lighting conditions.

119. With respect to Plaintiff Michael Dilworth, this is particularly devastating because his career was commercial truck driving, including heavy haul Tri-axle Dump Truck Operator, via his commercial driver's license (CDL); and, it is believed and averred that the loss of his CDL is pending and that his sudden onset NAION injury diagnosis due to use of Ozempic will result in the loss of his career and his CDL.

---

[37] https://www.aao.org/eyenet/article/naion-diagnosis-and-management

120. Patients with NAION suffer from blurred or darkened vision obstructing their field of view, as well as loss of color vision and loss of contrast in vision.[38]

121. About 15% of patients who have NAION in one eye eventually develop it in their other eye. Id.

122. GLP-1 RAs are treated as an established pharmacologic class (EPC) by the FDA, and the class of drugs shares a similar mechanism of action, similar physiologic effects, and similar chemical structure.

123. It has been known since at least 2016 that the human eye contains GLP-1 Receptors.[39]

124. Defendants knew or should have known of the causal association between the use of Ozempic and the risk of developing NAION and its sequelae, but Defendants ignored said causation and risk.

125. The FDA's Adverse Events Reporting System (FAERS) shows multiple reports of "Optic Ischemic Neuropathy" reported in connection with the use of GLP-1 RAs.

126. The earliest reported Optic Ischemic Neuropathy event associated with any GLP-1 RA occurred in 2012, and the earliest associated with semaglutide specifically was in 2019.[40]

---

[38] *Ischemic Optic Neuropathy,* Cleveland Clinic. https://my.clevelandclinic.org/health/diseaes/ischemic-optic-neuropathy

[39] 47 Hernández C et al, Topical Administration of GLP-1 Receptor Agonists Prevents Retinal Neurodegeneration in Experimental Diabetes, DIABETES 2016 Jan;65(1):172-87. doi: 10.2337/db15-0443. Epub 2015 Sep 17. PMID: 26384381.

[40] The FAERS database is accessible online at https://www.fda.gov/drugs/questions-andanswers-fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faerspublic-dashboard.

127. A meta-analysis of all clinical trials of GLP-1RA drugs, including Novo Nordisk's own clinical trials, found a non-statistically significant increased risk of optic ischemic neuropathy.[41]

12. The authors note that optic ischemic neuropathy is rare and may have been underreported in clinical trials, leading to a lower estimated risk. Id.

129. A Novo Nordisk spokesperson acknowledged that cases of NAION, which leads to severe and irreversible vision loss, were identified in Novo Nordisk's clinical trials.[42]

130. Semaglutide use is associated with a significantly increased risk of NAION compared to control medications, with a pooled hazard ratio of 2.620 (95 % CI: 1.808-3.795, $P < 0.001$). See, https://pubmed.ncbi.nlm.nih.gov/40962119/

131. Defendants knew or should have known of the risk of NAION with use of Ozempic.

132. Defendants conduct clinical trials and have access to case reports and medical literature that provides them with superior knowledge compared to the general public as to potential risks of its medications.

133. For example, a clinical trial entitled "A Research Study to Compare Two Doses of Semaglutide Taken Once Weekly in People With Type 2 Diabetes (SUSTAIN FORTE)" with results first submitted in August 2021, involved a participant who developed optic ischemic

---

[41] Silverii GA et al, Glucagon-like peptide 1 (GLP1) receptor agonists and risk for ischemic optic neuropathy. A meta-analysis of randomized controlled trials, Diabetes Obes Metab, 2024 (available as a pre-print manuscript as of November 20, 2024), https://dom-pubs.periclesprod. literatumonline.com/doi/10.1111/dom.16076.

[42] Kevin Dunleavey, After studies flag possible link between Novo's Ozempic and rare eye disorder, Danish agency calls for probe, Fierce Pharma, (December 17, 2024), available at https://www.fiercepharma.com/pharma/novo-nordisk-faces-new-reports-suggesting-linkbetween-ozempic-and-blindness (last visited 12/18/2024); See also Naomi Kresge, Ozempic Link to Rare Vision Loss Risk Confirmed in Study, Bloomberg, (bloomberg.com/news/articles/2024-12-16/ozempic-blinding-link-potential-prompts-regulator-to-seek-probe)

neuropathy which was categorized as a serious adverse event.[43]

134. The event occurred within the Semaglutide 2.0 mg dosage group, which included 479 participants, which is significant given the low background incidence of NAION. Id.

135. Clinical observations by astute neuro-ophthalmologists at the Harvard affiliated Massachusetts Eye and Ear ("Mass Eye and Ear") who noted a surge of NAION cases amongst patients on Ozempic led them to conduct a retrospective, matched cohort study of neuro ophthalmic patients at Mass Eye and Ear, Boston.

136. The study "Risk of Nonarteric Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide", authored by Hathaway *et al.*, involved patients examined in the neuro ophthalmology clinic between December 1, 2017, and November 30, 2023, and consisted of 17,298 patients, including 16,827 patients over the age of 12, 710 of which had type 2 diabetes (T2D), and 979 were overweight or obese.[44]

137. Of the 710 T2D patients, 194 patients were prescribed semaglutide and 516 were prescribed other non-GLP-1 RA antidiabetic medications. Id.

138. Of the 979 overweight/obese patients, 361 were prescribed semaglutide and 618 were prescribed other non-GLP-1 RA anti-obesity medications. Id.

139. Within the T2D study population, NAION occurred in 17 patients in the semaglutide cohort vs. 6 in the non-GLP-1 RA cohort. The Kaplan-Meier survival analysis at 36 months

---

[43] A Research Study to Compare Two Doses of Semaglutide Taken Once Weekly in People With Type 2 Diabetes (SUSTAIN FORTE). ClinicalTrials.gov identifier: NCT03989232. Updated February 13, 2023.

[44] Hathaway JT, Shah MP, Hathaway DB, et al. Risk of Nonarteritic Anterior Ischemic Optic Neuropathy; Neuropathy in Patients Prescribed Semaglutide. JAMA Ophthalmol. 2024;142(8):732–739. doi:10.1001/jamaophthalmol.2024.2296

showed a cumulative incidence of NAION of 8.9% (95% CI, 4.5%-13.1%) for the Semaglutide cohort vs 1.8% (95% CI, 0%-3.5%) for the non-Semaglutide cohort and the Cox proportional hazards regression model showed a higher NAION risk in the Semaglutide cohort vs the non-Semaglutide cohort (HR, 4.28; 95% CI, 1.62-11.29; $P < .001$; concordance coefficient = 0.84). Id.

140. Within the overweight/obese cohort, NAION occurred in 20 patients in the semaglutide cohort vs. 3 in the non-GLP-1 RA cohort. The Kaplan-Meier survival analysis at 36 months showed a cumulative incidence of NAION of 6.7% (95% CI, 3.6%-9.7%) for the Semaglutide cohort vs 0.8% (95% CI, 0%-1.8%) for the non-semaglutide cohort and the Cox proportional hazards regression model showed a higher NAION risk in the Semaglutide cohort vs the non-Semaglutide cohort (HR, 7.64; 95% CI, 2.21-26.36; P < .001; concordance correlation coefficient = 0.86).  Id.

141. The primary outcome of the Hathaway *et al.* study is that use of Ozempic is associated with an increased risk of NAION. "The relatively high HRs (4.28 and 7.64 for our T2D and overweight or obese cohorts, respectively) identified by our Cox regression analyses reveal a substantially increased risk of NAION among individuals prescribed Semaglutide relative to those prescribed other medications to treat T2D and obesity or overweight." Id.

142. Acknowledging the pathogenesis or cause of NAION remains unknown. The authors did not determine the mechanism in which semaglutide causes NAION, however, it was hypothesized that expression of the GLP-1 receptor in the optic nerve and GLP-1 RA–induced enhanced sympathetic nervous system activity might influence optic nerve head perfusion and potentially increase the risk of NAION. Id.

143. A meta-analysis of all clinical trials of GLP-1 receptor drugs, including Defendant's own clinical trials, found a non-statistically increased risk of optic ischemic neuropathy; and, because optic ischemic neuropathy is rare, the authors note there may have been underreporting in the clinical trials, leading to a lower estimated risk; however, the study concluded the overall rate of optic ischemic neuropathy was higher in the GLP1-RA group compared to the placebo group: 5.6 and 3.0 cases per 100,000 patient-years, respectively which is nearly a doubling of the risk.[45]

144. On December 11, 2024, a pre-print of an article entitled "Use of semaglutide and risk of non-arteritic anterior ischemic optic neuropathy: A Danish- Norwegian cohort study", found an association between use of semaglutide for type 2 diabetes.[46]

145. This cohort study compared the risk of NAION among individuals with type 2 diabetes using Semaglutide compared to those using sodium-glucose co-transporter 2 inhibitors (SGLT-2s), another diabetes medication, where the authors concluded there is "an association between use of Semaglutide for type 2 diabetes and risk of NAION, with a more than two-fold increased hazard ratio."[47]

146. In a registry-based prospective cohort study identifying 424,152 patients diagnosed with type 2 diabetes in Denmark between December 1, 2018, and December 31, 2023, 106,454

---

[45] Silverii GA, Pala L, Cresci B, Mannucci E. Glucagon-like peptide 1 (GLP1) receptor agonists and risk for ischemic optic neuropathy: A meta-analysis of randomized controlled trials. *Diabetes Obes Metab*. 2025; 27(2): 1005-1009. doi:10.1111/dom.16076

[46] Simonsen E, Lund LC, Ernst MT, et al. Use of semaglutide and risk of non-arteritic anterior ischemic optic neuropathy: A Danish–Norwegian cohort study. Published online December 11, 2024. doi:10.1101/2024.12.09.24318574

[47] Grauslund J, Taha AA, Molander LD, et al. Once-weekly semaglutide doubles the five-year risk of nonarteritic anterior ischemic optic neuropathy in a Danish cohort of 424,152 persons with type 2 diabetes. *Intl. Journal of Retina and Vitreous*. 2024;10(1):97. doi:10.1186/s40942-024-00620-x

of these patients were exposed to Semaglutide and 67 developed NAION.  Id.

147. "Exposure to once weekly Semaglutide was followed by 67 events of NAION during 294,395 years of observation as compared to 151 events during the 1,620,725 years of observation for non-exposed."  Id.

148. The study concluded use of Semaglutide "more than doubles the risk of NAION, even when multiple other factors have been taken into account."  Id.

149. Said study also observed that "after the introduction of once-weekly semaglutide in Denmark in November 2018, the annual number of first-time NAION episodes reached an all-time high for the years 2019-2023. Id.

150. Due to the findings of the two studies out of Denmark, as of January 17, 2025, the Pharmacovigilance Risk Assessment Committee (PRAC) of the Danish Medicines Agency has required Novo Nordisk to review and submit available data related to semaglutide and NAION. The PRAC will review and determine if a label change is warranted or if other risk minimization efforts should be pursued.[48]

151. In response, Novo Nordisk has acknowledged cases of NAION were identified within their clinical trials.[49]

152. In a case series published by Katz *et al.*, "Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide," also examined nine patients taking GLP1-RA medications who had experienced ophthalmologic complications. Of the nine patients, seven developed NAION.[50]

---

[48] https://laegemiddelstyrelsen.dk/en/news/2024/suspicion-of-rare-eye-condition-from-ozempicuse-to-be-investigated-further/

[49] https://www.fiercepharma.com/pharma/novo-nordisk-faces-new-reports-suggesting-linkbetween- ozempic-and-blindness

[50] Katz BJ, Lee MS, Lincoff NS, et al. Ophthalmic Complications Associated With the

153. The Katz article included a report of a female patient with type 2 diabetes taking insulin and Semaglutide and evidence of positive challenge and rechallenge with semaglutide. Id.

154. The morning after said patient's first injection of Semaglutide, she experienced vision loss in her left eye and was diagnosed with bilateral optic nerve swelling and the initial impression was optic neuritis with poor recovery; thereby, discontinued the medication only to start it again approximately two months later after which she experienced painful vision loss in her right eye; and, Imaging performed on the right eye was consistent with NAION.

155. A study published on April 7, 2025, analyzing FDA Adverse Event reports indicates increased reports of vision impairment linked to semaglutide use. Compared to other diabetes and weight loss medications, users of semaglutide showed "significantly higher" reports of vision impairment.[51]

156. Despite the growing number of articles, reports, and an investigation by PRAC of the Danish Medicines Agency, Defendant still provides no warnings about the dangerous side effect of NAION in conjunction with use of Ozempic.

157. On or about February 26, 2026, the Office of Prescription Drug Promotion (OPDP) of the U.S. Food and Drug Administration (FDA) sent a notice to Defendants regarding Defendants' recent promotional communication, a direct-to-consumer (DTC) video (video), titled "Ozempic vs. – Random Guy OLV" (US25OZM01130) for Ozempic injection, for subcutaneous use (Ozempic) submitted by Novo Nordisk Inc. (Novo Nordisk) under cover of Form FDA 2253.1 FDA has determined that the video is false or misleading, whereby the FDA found the video misbrands Ozempic and makes the distribution of the drug in violation of the Federal

---

Antidiabetic Drugs Semaglutide and Tirzepatide. *JAMA Ophthalmol*. Published online January 30, 2025. doi:10.1001/jamaophthalmol.2024.6058

[51] https://pmc.ncbi.nlm.nih.gov/articles/PMC11974072/

Food, Drug, and Cosmetic Act and the FDA thereby found the video includes claims and presentations that misrepresent the efficacy of Ozempic.[52]

158. On March 5, 2026, the US FDA issued a warning letter to Defendant Novo Nordisk Inc. for the FDA's findings of failure to develop written procedures for the surveillance, receipt, evaluation, and reporting of postmarketing adverse drug experiences (ADEs) to FDA as required by 21 CFR 314.80(b), including over potential unreported Ozempic side effects and deaths.[53]

<u>NOVO NORDISK/DEFENDANTS' CONTINUED FAILUE/REFUSAL TO DISCLOSE THE RISK OF NAION AND ITS SEQUELA</u>

159. According to the Drugs@FDA website, the label for Ozempic has been updated on at least fourteen (14) occasions since 2017, with the most recent update in October, 2025.[54] Despite the fact there are at least fourteen (14) iterations of the Ozempic label, Defendants' labels have not contained any warning or any information whatsoever on the increased propensity of Ozempic to cause NAION and permanent vision loss as suffered by Plaintiff.

160. On June 6, 2025 the European Medicines Agency (EMA) recommended that the product information for semaglutide medicines including Ozempic, Wegovy, Rybelsus include NAION as a side effect.[55]

161. At all times pertinent to Plaintiff Michael Dilworth being prescribed, and using Ozempic, the Ozempic warning label remained devoid of any mention of NAION.

---

[52] https://www.fda.gov/media/191387/download?attachment
[53] See, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/novo-nordisk-inc-717576-03052026 and https://www.forbes.com/sites/martinadilicosa/2026/03/10/fda-warns-novo-nordisk-over-potential-unreported-ozempic-side-effects-deaths/
[54] https://www.accessdata.fda.gov/drugsatfda_docs/label/2025/209637s035,209637s037lbl.pdf
[55] https://www.ema.europa.eu/en/news/prac-concludes-eye-condition-naion-very-rare-sideeffect-semaglutide-medicines-ozempic-rybelsus-wegovy

162. Defendants have failed to take steps to otherwise warn the medical community, particularly physicians within the ophthalmologic community, to encourage a baseline eye exam prior to starting Ozempic, monitoring of patients while on the medication, advising patients to cease use of the medication if they develop symptoms consistent with NAION, or after the fact as to not risk the potential for injury in the other eye.

163. Nothing was or is stopping Defendants from adding a warning regarding the risk of NAION. Defendant could have at any time made "moderate changes" to the labels.

164. Specifically, Defendant could have filed a "Changes Being Effected" ("CBE") supplement under Section 314.70(c) of the FDCA to make "moderate changes" to Ozempic's label without any prior FDA approval.

165. Examples of moderate label changes that can be made via a CBE supplement explicitly include changes "to reflect newly acquired information" in order to "add or strengthen a contraindication, warning, precaution, or adverse reaction." By definition and by regulation, such changes to add a warning based on newly acquired information—such as that imparted by newly emerging literature like the litany of studies cited above—are considered a "moderate change." §340.70(c)(6)(iii).

166. On July 3, 2024, the Journal of the American Medical Association ("JAMA") – Ophthalmology published a study suggesting an association between semaglutide and NAION. The study, which evaluated data from December of 2017 through November of 2023, showed that patients with type 2 diabetes taking semaglutide had a more than three times greater risk of

developing NAION than those taking non-GLP-1 RA medications. For patients taking semaglutide for overweight/obesity indications, the risk of developing NAION was nearly seven times greater than non-GLP-1 RA medications.[56]

167. The JAMA study referenced a potential causal mechanism, proposing that "expression of the GLP-1 receptor in the human optic nerve and GLP-1 RA induced enhanced sympathetic nervous system activity might influence optic nerve head perfusion and potentially increase the risk of NAION." Id.

168. The FDA's Adverse Events Reporting System (FAERS) shows multiple reports of "Optic Ischemic Neuropathy" reported in connection with use of GLP-1RAs. The earliest reported Optic Ischaemic Neuropathy event associated with any GLP-1RA occurred in 2012, and the earliest associated with semaglutide specifically was in 2019.[57]

PARTY PLAINTIFF MICHAEL DILWORTH

169. Plaintiff Michael Dilworth is a resident of the Eastern District of Pennsylvania and was 56 years old at the time he was prescribed and began using Ozempic.

170. On or around June 10, 2025, Plaintiff consulted with his Primary Care Medical Provider to discuss treatment options for glycemic control and related weight management.

---

[56] The study showed a cumulative incidence of NAION of 8.9% in type 2 diabetes patients taking semaglutide, compared to only 1.8% for patients not taking GLP-1RA medications, with a hazard ratio of 4.28. For overweight/obese patients, the cumulative incidence of NAION was 6.7% for patients taking semaglutide, compared to only 0.8% for those not taking GLP-1RAs, with a hazard ratio of 7.64. Jimena Tatiana Hathaway, et al., Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide, JAMA OPHTHALMOLOGY 2024;142(8):732-739 (published online July 3, 2024), available at https://jamanetwork.com/journals/jamaophthalmology/fullarticle/2820255

[57] The FAERS database is accessible online at https://www.fda.gov/drugs/questions-and-answersfdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-publicdashboard.

171. As a result, Plaintiff was prescribed Ozempic (Semaglutide) by his Primary Care Medical Provider on or about June 19, 2025, as part of a medically supervised plan to manage his metabolic health, including blood glucose levels and body weight, and Plaintiff began taking the prescribed Ozempic on or about June 19, 2025.

172. On or about September 24, 2025, Plaintiff's Ozempic dosage, as prescribed, increased to 2 mg/dose.

173. On or around November 28, 2025, Plaintiff Michael Dilworth experienced sudden onset vision loss in his right eye upon awakening.

174. In the next days, as the vision loss persisted, he was sent emergently to Wills Eye Hospital whereby the Ophthalmologist diagnosed Plaintiff Michael Dilworth with sudden onset, non-arteritic anterior ischemic optic neuropathy (NAION).

175. Plaintiff's sudden onset NAION vision loss has then also affected his left eye as well as right eye.

176. Plaintiff has stopped taking Ozempic.

177. Plaintiff's eyesight loss is permanent.

178. The onset of Plaintiff's optic-nerve NAION injury occurred after exposure to Ozempic and within a time frame consistent with drug-induced ischemic optic-nerve injury.

179. Prior to using Ozempic, Plaintiff had no history of NAION and had not previously experienced sudden optic-nerve ischemic events.

180. Plaintiff's NAION developed only after exposure to semaglutide Ozempic.

181. As a direct and proximate result of Defendants' design, manufacture, marketing, and failure to adequately warn about the risks associated with Ozempic/Semaglutide, Plaintiff

suffered NAION resulting in significant and permanent vision loss and other related damages as set forth more fully herein.

182. At all times material to the above, the Ozempic label failed to adequately warn Plaintiff Michael Dilworth and his medical providers of the true risks of taking Ozempic.

183. At all times material to the above, the marketing and advertising failed to adequately warn Plaintiff Michael Dilworth and his medical providers of the true risks of taking Ozempic.

184. Plaintiff's life is forever changed because of his usage of Ozempic.

185. Plaintiff Michael Dilworth will never see clearly again as a result of his usage of Ozempic.

186. Defendants knew or should have known that use of Semaglutide could lead to severe and debilitating injuries suffered by Plaintiff and numerous other patients.

187. Defendants continue to downplay the risk of NAION and have not changed or provided any warnings to the public and medical community.

188. Defendants' Ozempic was at all times utilized and prescribed in a manner foreseeable to Defendants.

189. Plaintiff used Ozempic, and did not misuse, or alter Ozempic in an unforeseeable manner.

190. Through its affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff and his physicians the true and significant risks associated with this medication.

191. As a result of direct of Defendants' actions, commissions and/or omissions, Plaintiff and his physicians were unaware, and could not have reasonably known or learned through

reasonable diligence, that Plaintiff would be exposed to the risks identified in this Complaint and that those risks were the direct and proximate result of Defendants' conduct.

192. As a direct and proximate result of being prescribed and using Ozempic, Plaintiff has been permanently and severely injured, having suffered serious consequences.

193. As a direct and proximate result of his Ozempic use, Plaintiff has suffered, and continues to suffer severe mental and physical bodily injury and pain and suffering with permanent injuries and emotional distress, loss of earnings, loss of ability to earn money and other economic losses including past and future medical expenses.

194. Had Plaintiff and/or Plaintiff's physicians known of the true risks of NAION associated with the use of Ozempic, Plaintiff and/or Plaintiff's physicians would not have used the medication and would have chosen a different option for treatment.

195. Plaintiff's life is permanently altered as a result of Defendants' acts, commissions and omissions.

COUNT I
STRICT LIABILITY – FAILURE TO WARN
Plaintiff Michael Dilworth v. Defendants

196. Plaintiff incorporates by reference the foregoing paragraphs as though fully set forth herein.

197. Ozempic and Semaglutide are a product within the meaning of Pennsylvania products liability law.

198. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, sponsoring, warranting, inspecting, handling, storing, distributing, and/or promoting Ozempic placed this drug into the stream of

commerce in a defective and unreasonably dangerous condition whereby these actions, commissions and omissions were under the ultimate control and supervision of Defendants.

199. Defendants, as the holder of the NDA, is responsible for communications to the FDA and associated regulatory authorities, reporting adverse events, label changes, post-market surveillance and pharmacovigilance.

200. Defendants, as a manufacturer, distributer, and marketer of pharmaceutical drugs, is held to the level of knowledge of an expert in the field, and further, Defendant knew or should have known that warnings and other clinically relevant information and data which they distributed regarding the risks associated with the use of Ozempic and Semaglutide were inadequate.

201. Defendants designed and implemented marketing campaigns that emphasized the weight-loss effects of semaglutide products, which predictably and foreseeably led physicians to prescribe Ozempic to non-diabetic patients seeking weight management.

202. At all times relevant, Defendants, and/or through authorized agents or employees, were engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, sponsoring, warranting, inspecting, handling, storing, distributing, promoting and/or introducing into the stream-of-commerce the Ozempic Product so as to reach users including Plaintiff without substantial change from its condition at time of manufacture, distribution and/or sale.

203. Defendants:

(a) marketed GLP-1 drugs in a way that blurred lines between diabetes and weight loss use;

(b) knew and intended that physicians would prescribe semaglutide for weight loss—even when labeled as Ozempic;

(c) failed to adequately warn about the risk of NAION in patients using semaglutide for weight-loss purposes, despite knowing that such use was widespread and foreseeable; and

(d) at all relevant times, Defendants knew or should have known that semaglutide-containing medications, including Ozempic, would be prescribed by healthcare providers for the treatment of metabolic conditions and for weight management, including in patients with prediabetes or elevated A1c levels, and such use was foreseeable and consistent with the manner in which Defendants marketed and distributed their products.

204. Defendants failed to adequately warn Plaintiff's prescribing medical provider, and the medical community, and Plaintiff, of the risk that its Semaglutide-containing medications, including Ozempic, can cause or contribute to NAION and sudden vision loss.

205. Plaintiff did not have the same knowledge as Defendants and no adequate warning, other clinically relevant information, or data was communicated to Plaintiff or to Plaintiff's prescribing and treating physicians.

206. Defendants had a duty to provide adequate warnings and instructions for Ozempic, and to use reasonable care to design a product that is not unreasonably dangerous to users, and to adequately understand, test, and monitor their products.

207. Defendants had a continuing duty to provide consumers, including Plaintiff and Plaintiff's physicians, with warnings and other clinically relevant information and data regarding the risks and dangers associated with Ozempic, as it became or could have become available to Defendants.

208. Defendants marketed, promoted, sponsored, warranted, distributed and sold an unreasonably dangerous and defective prescription drugs, Ozempic, to health care providers empowered to prescribe and dispense Ozempic  to consumers, including Plaintiff, without

adequate warnings and other clinically relevant information and data.

209. Through both omission and affirmative misstatements, Defendant misled and continues to mislead the medical community about the risk and benefit balance of Ozempic, which resulted in permanent injuries to Plaintiff.

210. Defendant knew or should have known through testing, scientific knowledge, advances in the field, or otherwise, that Ozempic created a risk of serious and potentially irreversible vision issues, sudden vision loss or blindness, severe optic nerve damage, and NAION in one or potentially both eyes.

211. Despite the fact that Defendants knew or should have known that Ozempic caused unreasonable and dangerous side effects, Defendants have continued to promote and market Ozempic without providing adequate clinically relevant information and failed and/or refused to disclose/report adverse events including serious injury and/or deaths.

212. Defendant knew or should have known that consumers, Plaintiff, specifically, would foreseeably and needlessly suffer injury as a result of Defendants' failures and/or refusals.

213. The Ozempic supplied to Plaintiff by Defendants was defective, unreasonably dangerous, and had inadequate warnings or instructions at the time it was sold.

214. Defendants possessed knowledge and information confirming the defective and unreasonably dangerous nature of Ozempic but, despite this knowledge and information, Defendants failed and neglected to issue adequate warnings that Ozempic causes serious and potentially irreversible vision issues, optic nerve damage, and particularly NAION. Defendant has yet to issue any warnings or recommendations that patients taking Ozempic undergo ophthalmological monitoring for said issues.

215. Defendants' failure to provide adequate warnings or instructions rendered Ozempic

unreasonably dangerous in that it failed to perform as safely as an ordinary patient, prescriber, and/or other consumer would expect when used as intended and/or in a manner reasonably foreseeable by the Defendants, and in that the risk of danger outweighs the benefits.

216. Defendants failed, continue to fail, to provide adequate warnings to physicians, pharmacies, and consumers, including Plaintiff and Plaintiff's intermediary physicians.

217. Defendants failed to include adequate warnings and/or provide adequate clinically relevant information and data that would alert Plaintiff and Plaintiff's physicians to the dangerous risks of Ozempic including, among other things, potentially irreversible vision issues such as NAION and optic nerve damage.

218. Defendants failed to provide adequate post-marketing warnings and instructions after Defendants knew or should have known of the significant risks of, among other things, potentially irreversible vision issues and optic nerve damage.

219. Defendants continued to aggressively promote and sell Ozempic, even after they knew or should have known of the unreasonable risks of potentially irreversible vision issues and optic nerve damage from the drugs.

220. Defendants had an obligation to provide Plaintiff and Plaintiff's physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with exposure to Ozempic, and/or that there existed safer and/or equally effective alternative drug products that do not pose this same risk.

221. By failing to adequately test and research harms associated with Ozempic, and by failing to provide appropriate warnings and instructions about use, patients and the medical community, including prescribing doctors, were inadequately informed and/or misinformed about the true risk-benefit profile of Ozempic and were not sufficiently aware that serious and

potentially irreversible vision issues and optic nerve damage were associated with use of Ozempic; and, thereby, nor were the medical community, patients, patients' families, or regulators appropriately informed that serious and potentially irreversible vision issues and optic nerve damage is a side effect of Ozempic and should or could be reported as an adverse event.

222. The Semaglutide products designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants were defective due to inadequate postmarketing surveillance and/or warnings because, even after Defendants knew or should have known of the risks of severe and permanent vision loss and optic nerve injuries including NAION from using Ozempic, Defendants failed and refused to provide adequate warnings to users or consumers of the products, and continued to improperly advertise, market and/or promote.

223. Ozempic and Wegovy, a/k/a Semaglutide are defective and unreasonably dangerous to Plaintiff and other consumers regardless of whether Defendants had exercised all possible care in their preparation and sale.

224. The foreseeable risk of serious and potentially irreversible vision issues and harm to the optic nerve caused by Ozempic could have been reduced or avoided by Plaintiff, prescribers, and/or other consumers had Defendants provided reasonable instructions or warnings of these foreseeable risks of harm.

225. As a direct and proximate result of Defendants' conduct, jointly and/or severally, including the inadequate warnings, lack of information, lack of adequate testing and research, and the defective and dangerous nature of Ozempic/Semaglutide, Plaintiff has suffered severe personal bodily injuries and resulting pain and suffering, including:  NAION (Nonarteritic Anterior Ischemic Optic Neuropathy), sudden onset vision loss with permanent optic nerve

damage/injury and swelling, field of vision loss, peripheral vision loss, disability, restrictions, interference with activities of daily living, mental anguish, emotional distress, loss of enjoyment of life, expenses of medical care and treatment, loss of earnings, loss of earning capacity and other economic losses, embarrassment, humiliation, whereby said injuries and losses are continuing and most likely permanent in nature, and Plaintiff will suffer the injuries and losses in the future.

226. As a direct and proximate result of Defendants' conduct, jointly and/or severally, Plaintiff Michael Dilworth:

(a) has been, and may in the future be, prevented from attending to his usual/customary duties, responsibilities, interests, vocations and avocations, with economic loss, loss of earnings;

(b) has been and will continue to have medical procedures and treatments, with risks, hazards, pain, suffering, humiliation, embarrassment and economic loss; and

(c) has/will be required to expend money for medicines and medical care, to treat these injuries.

WHEREFORE, Plaintiff demands judgment in his favor and against the Defendants, jointly and severally, in an amount in excess of $150,000, plus interest, costs, punitive damages, and such other relief as this Court deems just and proper.

COUNT II
STRICT LIABILITY – DESIGN DEFECT
Pursuant to Applicable Product Liability Law
Plaintiff Michael Dilworth v. Defendants

227. Plaintiff incorporates by reference the foregoing paragraphs as though fully set forth herein.

228. At all relevant times, Defendants engaged in the business of researching, testing,

developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, warranting, sponsoring, and/or promoting Ozempic and placed this drug into the stream of commerce in a defective and unreasonably dangerous condition and whereby these actions were under the ultimate control and supervision of Defendant.

229. Defendants, as the holder of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting adverse events, label changes, post-market surveillance, and pharmacovigilance.

230. Defendants, as a manufacturer, designer, distributor, and marketer of pharmaceutical drugs, had a duty to design a product free from a defective condition that was unreasonably dangerous to the Plaintiff.

231. Ozempic/Semaglutide is designed in such a way that posed an unreasonable risk of permanent vision loss and optic nerve injuries including NAION and was kept on the market despite being in a defective condition.

232. Defendants knew or should have known the Ozempic/Semaglutide they developed, manufactured, labeled, marketed, sold, and/or promoted were defectively designed in that they posed a serious risk of severe and permanent vision and optic nerve injuries including NAION.

233. At all times relevant, Defendants, and/or through authorized agents or employees, were engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, sponsoring, warranting, inspecting, handling, storing, distributing, promoting and/or introducing into the stream-of-commerce the Ozempic Product so as to reach users including Plaintiff without substantial change from its condition at time of manufacture, distribution and/or sale.

234. Defendants had a continuing duty to design a product that is not unreasonably dangerous to users and to adequately understand, test, and monitor their product.

235. Defendants sold, marketed and distributed products that are unreasonably dangerous for their normal, intended, and foreseeable use.

236. Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, warranted, sponsored, sold and distributed Ozempic, a defective product which created an unreasonable risk to the health of consumers, and Defendant is therefore strictly liable for the injuries sustained by Plaintiff.

237. The Ozempic supplied to Plaintiff by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer or supplier, it was in an unreasonably dangerous and a defective condition because it failed to perform as safely as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable to Defendants, posing a risk of serious and potentially irreversible vision issues and optic nerve damage including NAION to Plaintiff and other consumers.

238. The Ozempic taken by Plaintiff was expected to, and did, reach Plaintiff without substantial change in the condition in which it is sold.

239. The Ozempic taken by Plaintiff was in a condition not contemplated by the Plaintiff in that it was unreasonably dangerous, posing a serious risk of permanent vision loss and optic nerve damage.

240. Ozempic/Semaglutide in fact causes serious and potentially irreversible vision issues, severe optic nerve damage, sudden blindness, and NAION, in one or both eyes, harming Plaintiff and other consumers.

241. Plaintiff, ordinary consumers, and prescribers would not expect a diabetes drug designed, marketed, promoted, sponsored and labeled for weight loss and marketed for its supposed health benefits to cause irreversible vision issues and optic nerve damage.

242. The Ozempic supplied to Plaintiff by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer or supplier, it had not been adequately tested, was in an unreasonably dangerous and defective condition, and posed a risk of serious and potentially irreversible vision issues and optic nerve damage including NAION to Plaintiff and other consumers.

243. The Ozempic supplied to Plaintiff by Defendant was defective in design or formulation in that its alleged benefits did not outweigh the risks of serious and potentially irreversible vision issues and optic nerve damage including NAION posed by the drug; whereby, in light of the utility of the drug and the risk involved in its use, the design of Ozempic makes the product unreasonably dangerous.

244. Ozempic's design is more dangerous than a reasonably prudent consumer would expect when used in its intended or reasonably foreseeable manner; and, Ozempic was more dangerous than Plaintiff expected.

245. The intended or actual utility of Ozempic is not of such benefit to justify the risk of optic nerve damage and NAION that may be irreversible and permanently disabling thereby rendering the product unreasonably dangerous.

246. The design defects render Ozempic more dangerous than other drugs and therapies designed to treat type 2 diabetes and obesity and cause an unreasonable increased risk of injury, including, but not limited, to potentially irreversible vision issues and optic nerve damage including NAION.

247. Defendants knew or should have known through testing, scientific knowledge, advances in the field, or otherwise, that Ozempic created a risk of serious and potentially irreversible vision issues, severe optic nerve damage, sudden blindness, and NAION in one or both eyes.

248. Ozempic is defective and unreasonably dangerous to Plaintiff and other consumers in that, despite knowledge that Ozempic could result in sudden onset/vision loss issues including NAION, Defendants failed to adequately test or study the drugs, including but not limited to: pharmacokinetics and pharmacodynamics of the drugs, its effects on vision and the optic disc, the potential for inter-patient variability, and/or the potential for a safer effective dosing regimen.

249. Defendants acted unreasonably in their design of Ozempic and Semaglutide in that Defendants failed to adopt a safer design for the product that was practical, feasible, and otherwise a reasonable alternative design or formulation that would have prevented or substantially reduced the risk of harm without substantially impairing the usefulness, practicality, or desirability of the product.

250. Defendants knew or should have known that consumers, and Plaintiff specifically, would foreseeably and needlessly suffer injury as a result of Ozempic's defective design.

251. Ozempic is defective and unreasonably dangerous to Plaintiff and other consumers even if Defendants had exercised all possible care in the preparation and sale of the product.

249. As a direct and proximate result of Defendants' conduct, jointly and/or severally, including the inadequate warnings, lack of information, lack of adequate testing and research, and the defective and dangerous nature of Ozempic/Semaglutide, Plaintiff has suffered severe personal bodily injuries and resulting pain and suffering, including:  NAION (Nonarteritic Anterior Ischemic Optic Neuropathy), sudden onset vision loss with permanent optic nerve damage/injury

and swelling, field of vision loss, peripheral vision loss, disability, restrictions, interference with activities of daily living, mental anguish, emotional distress, loss of enjoyment of life, expenses of medical care and treatment, loss of earnings, loss of earning capacity and other economic losses, embarrassment, humiliation, whereby said injuries and losses are continuing and most likely permanent in nature, and Plaintiff will suffer the injuries and losses in the future.

252. As a direct and proximate result of Defendants' conduct, jointly and/or severally, Plaintiff Michael Dilworth:

(a) has been, and may in the future be, prevented from attending to his usual/customary duties, responsibilities, interests, vocations and avocations, with economic loss, loss of earnings;

(b) has been and will continue to have medical procedures and treatments, with risks, hazards, pain, suffering, humiliation, embarrassment and economic loss; and

(c) has/will be required to expend money for medicines and medical care, to treat these injuries.

WHEREFORE, Plaintiff demands judgment in his favor and against the Defendants, jointly and severally, in an amount in excess of $150,000, plus interest, costs, punitive damages, and such other relief as this Court deems just and proper.

COUNT III
NEGLIGENT FAILURE TO WARN
Plaintiff Michael Dilworth v. Defendants

253. Plaintiff incorporates by reference the foregoing paragraphs as if fully stated herein.

254. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic and placed these drugs into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

255. Defendant, as the holder of the NDA, is responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

256. Ozempic was expected to reach, and did reach, users and/or consumers, including Plaintiff, without substantial change in the defective and unreasonably dangerous condition in which it was sold or distributed.

257. Defendants owed Plaintiff and other Ozempic users a duty to exercise reasonable care in marketing, advertising, promoting, distributing and/or selling Ozempic.

258. At all times material, Ozempic was used by Plaintiff in a manner intended and/or foreseeable to Defendants.

259. A reasonable patient or consumer of Ozempic/Semaglutide would expect the drug to be free of significant defects.

260. Defendants knew or had reason to know of facts establishing that Ozempic could cause NAION and failed to warn of the risk.

261. At all times relevant hereto, the defective nature of Ozempic was known to Defendant, or reasonably and scientifically knowable to them, through appropriate research and testing by known methods, at the time they distributed, supplied, or sold Ozempic, and not known to ordinary physicians who would be expected to prescribe the drug to their patients.

262. In disregard of its duty to timely warn consumers of health risks associated with Ozempic (Semaglutide), Defendants committed one or more of the following negligent acts, commissions, and/or omissions:

a. Failing to properly and adequately warn and instruct Plaintiff and Plaintiff's treating physicians that Ozempic was designed and/or manufactured in a way that it could cause injuries and damages, including permanent vision loss;

b. Failing to timely disclose to Plaintiff and Plaintiff's prescribing and treating physicians the risk of NAION;

c. Failing to timely warn Plaintiff and Plaintiff's physicians that a base line eye exam should be performed and monitoring was necessary.

263. At all relevant times, the label for Ozempic was inadequate because it did not warn and/or adequately warn of all possible adverse side effects of NAION and permanent vision loss.

264. At all relevant times, the label for Ozempic was inadequate because it did not warn and/or adequately warn that Ozempic had not been sufficiently and/or adequately tested for safety risks, including NAION.

265. The labels for Ozempic were inadequate because they did not warn and/or adequately warn of all possible adverse side effects concerning the failure and/or malfunction of Ozempic.

266. Defendants' failure to warn of the above was the proximate cause of Plaintiff's injuries, harm, damages and economic loss, from which Plaintiff continues to suffer.

267. Defendant's failure to warn of the significant risks of Ozempic use prevented Plaintiff and Plaintiff's treating physicians from conducting a proper assessment of the risks and benefits of using Ozempic.

268. Had Plaintiff and/or Plaintiff's treating physicians been properly warned of the significant risks of Ozempic/Semaglutide, Plaintiff would not have elected to begin and/or continue Ozempic/Semaglutide.

269. Reasonable, safer alternative treatments were available to Plaintiff and/or Plaintiff's treating physicians had they been warned of these significant risks outlined herein.

270. As a direct and proximate result of Defendants' conduct, jointly and/or severally, including the inadequate warnings, lack of information, lack of adequate testing and research, and the defective and dangerous nature of Ozempic/Semaglutide, Plaintiff has suffered severe personal bodily injuries and resulting pain and suffering, including:  NAION (Nonarteritic Anterior Ischemic Optic Neuropathy), sudden onset vision loss with permanent optic nerve damage/injury and swelling, field of vision loss, peripheral vision loss, disability, restrictions, interference with activities of daily living, mental anguish, emotional distress, loss of enjoyment of life, expenses of medical care and treatment, loss of earnings, loss of earning capacity and other economic losses, embarrassment, humiliation, whereby said injuries and losses are continuing and most likely permanent in nature, and Plaintiff will suffer the injuries and losses in the future.

271. As a direct and proximate result of Defendants' conduct, jointly and/or severally, Plaintiff Michael Dilworth:

(a) has been, and may in the future be, prevented from attending to his usual/customary duties, responsibilities, interests, vocations and avocations, with economic loss, loss of earnings;

(b) has been and will continue to have medical procedures and treatments, with risks, hazards, pain, suffering, humiliation, embarrassment and economic loss; and

(c) has/will be required to expend money for medicines and medical care, to treat these injuries.

WHEREFORE, Plaintiff demands judgment in his favor and against the Defendants, jointly and severally, in an amount in excess of $150,000, plus interest, costs, punitive damages, and such other relief as this Court deems just and proper.

<u>COUNT IV</u>
<u>NEGLIGENCE</u>
Plaintiff Michael Dilworth v. Defendants

272. Plaintiff incorporates by reference the foregoing paragraphs as though fully set forth herein.

273. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, sponsoring, warranting, and/or promoting Ozempic and placed this drug into the stream of commerce in a defective and unreasonably dangerous condition, whereby these actions, commission, and omissions were under the ultimate control and supervision of Defendant.

274. Defendants, as the holder of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

275. At all relevant times, Defendants had a duty to exercise reasonable care in the manufacture, marketing, advertisement, supply, storage, transport, packaging, sale, and distribution of Ozempic/Semaglutide products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that did not cause users to suffer from unreasonable, dangerous side effects without an adequate warning—when used alone or in foreseeable combination with other drugs.

276. Defendants failed to exercise ordinary care in the labeling, design, manufacturing, testing, marketing, distribution and/or sale of Ozempic in that Defendants knew or should have known these drugs created a high risk of unreasonable harm to Plaintiff and other users.

277. Defendants had no reason to believe that intended and foreseeable users of Ozempic, such as Plaintiff, would realize the potential harm from use of these products.

278. Defendants failed to exercise reasonable care to inform users, such as Plaintiff, of Ozempic/Semaglutide's risk of serious and potentially irreversible vision issues and harm to the optic nerve including NAION.

279. Defendants breached their duty of care to Plaintiff and Plaintiff's physicians, in the testing, monitoring, and pharmacovigilance of Ozempic and Wegovy.

280. In disregard of its duties, Defendants negligently and/or carelessly acted as follows:

a. Manufacturing, producing, overpromoting, formulating, creating, developing, designing, selling, promoting, advertising, warranting, sponsoring and distributing Ozempic without thorough and adequate pre- and post-market testing of the products;

b. Manufacturing, producing, overpromoting, advertising, formulating, creating, developing, and designing, and distributing Ozempic while negligently and intentionally concealing and failing to disclose clinical data and adverse events which demonstrated the risk of serious harm associated with the use of Ozempic;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Ozempic was safe for its intended uses and foreseeable uses;

d. Failing to disclose and warn of the product defect to the medical community, and consumers that Defendants knew and had reason to know that Ozempic was indeed unreasonably unsafe and unfit for use by reason of the product defects and risk of harm to its users;

e. Failing to warn Plaintiff, the medical and healthcare community, and consumers that the Ozempic's risk of harm was unreasonable and that there were safer and effective alternative products available to Plaintiff and other consumers;

f. Failing to provide adequate instructions, guidelines, and safety precautions to those persons to whom it was reasonably foreseeable would use Ozempic;

g. Advertising, sponsoring, promoting, marketing, and recommending the use of Ozempic, while concealing and failing to disclose or warn of the dangers known by Defendant to be connected with, and inherent in, the use of this product;

h. Representing that Ozempic was safe for its intended use when in fact Defendants knew and should have known the product were not safe for their intended and foreseeable purposes;

i. Continuing to manufacture and sell Ozempic with the knowledge that Ozempic is unreasonably unsafe and dangerous;

j. Failing to use reasonable and prudent care in the design, research, testing, manufacture, and development of Ozempic so as to avoid the risk of serious harm associated with the use of semaglutide.

k. Failing to design and manufacture Ozempic so as to ensure the drug was at least as safe and effective as other similar products;

l. Failing to design and manufacture Ozempic was reasonably safe for its intended purpose in violation of objective safety standards;

m. Failing to ensure that Ozempic was accompanied by proper and accurate warnings about requiring baseline visual examinations and regular eye examinations while using the drug;

n. Failing to ensure that Ozempic was accompanied by proper and accurate warnings about possible adverse side effects associated with the use of Ozempic and that use of semaglutide created a high risk of severe, permanent injuries to vision and NAION; and

o. Failing to conduct adequate testing, including pre-clinical and clinical testing, and post-marketing surveillance to determine the safety of Ozempic.

281. A reasonable manufacturer, designer, distributor, promotor, or seller under the same or similar circumstances would not have engaged in the aforementioned acts, commissions and/or omissions.

282. As a direct and proximate result of Defendants' negligence, jointly and/or severally, including the inadequate warnings, lack of information, lack of adequate testing and research, and the defective and dangerous nature of Ozempic/Semaglutide, Plaintiff has suffered severe personal bodily injuries and resulting pain and suffering, including: NAION (Nonarteritic Anterior Ischemic Optic Neuropathy), sudden onset vision loss with permanent optic nerve damage/injury and swelling, field of vision loss, peripheral vision loss, disability, restrictions, interference with activities of daily living, mental anguish, emotional distress, loss of enjoyment of life, expenses of medical care and treatment, loss of earnings, loss of earning capacity and

other economic losses, embarrassment, humiliation, whereby said injuries and losses are continuing and most likely permanent in nature, and Plaintiff will suffer the injuries and losses in the future.

283. As a direct and proximate result of Defendants' conduct, jointly and/or severally, Plaintiff Michael Dilworth:

(a) has been, and may in the future be, prevented from attending to his usual/customary duties, responsibilities, interests, vocations and avocations, with economic loss, loss of earnings;

(b) has been and will continue to have medical procedures and treatments, with risks, hazards, pain, suffering, humiliation, embarrassment and economic loss; and

(c) has/will be required to expend money for medicines and medical care, to treat these injuries.

WHEREFORE, Plaintiff demands judgment in his favor and against the Defendants, jointly and severally, in an amount in excess of $150,000, plus interest, costs, punitive damages, and such other relief as this Court deems just and proper.

COUNT V
NEGLIGENT MISREPRESENTATION
Plaintiff Michael Dilworth v. Defendants

284. Plaintiff incorporates by reference the foregoing paragraphs as though fully set forth herein.

285. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, warranting, sponsoring, and/or promoting Ozempic and placed this drug into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

286. Defendants, as the holder of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

287. At all relevant times, Defendants negligently provided Plaintiff, Plaintiff's healthcare providers, and the general medical community with false or incorrect information or affirmatively omitted or failed to disclose material information concerning Ozempic, including, but not limited to, misrepresentations regarding the safety and known risks of Ozempic.

288. The information distributed by Defendants to the public, the medical community, Plaintiff and Plaintiff's healthcare providers, including advertising campaigns, labeling materials, print advertisements, commercial media, was false and misleading and contained omissions and concealment of truth about the dangers of Ozempic.

28. Defendants' conduct had the capacity to deceive and/or purpose in making these misrepresentations was to deceive and/or defraud the public and the medical community, including Plaintiff and Plaintiff's health care providers; to falsely assure them of the quality of Ozempic and induce the public and medical community, including Plaintiff and Plaintiff's healthcare providers to request, recommend, purchase, and prescribe Ozempic.

290. Defendants' intent and purpose in making these misrepresentations was to deceive and/or defraud the public and the medical community, including Plaintiff and Plaintiff's health care providers; to falsely assure them of the quality of Ozempic so as to induce the public and medical community, including Plaintiff and Plaintiff's healthcare provider to request, recommend, purchase, and prescribe Ozempic.

291. Defendants had a duty to accurately and truthfully represent and market to the medical and healthcare community, Plaintiff, Plaintiff's healthcare providers and the public, the

known risks of Ozempic, including its propensity to cause permanent sudden onset vision loss, NAION and injury to the optic nerve.

292. Defendants made continued omissions and commissions in the Ozempic and Semaglutide labeling, including promoting it as safe and effective while failing to warn of its propensity to cause permanent vision loss, NAION and injury to the optic nerve.

293. Defendants made additional misrepresentations beyond the product labeling by representing Ozempic as a safe and effective treatment for type 2 diabetes and/or weight loss with only minimal risks.

294. Defendants misrepresented and overstated the benefits of Ozempic to Plaintiff, Plaintiff's treaters, and the medical community without properly advising of the known risks to permanent vision loss and NAION.

295. In reliance upon the false and negligent misrepresentations and omissions made by Defendants, Plaintiff and Plaintiff's healthcare providers were induced to, and did use Ozempic, thereby causing Plaintiff to suffer severe and permanent injuries.

296. In reliance upon the false and negligent misrepresentations and omissions made by Defendants, Plaintiff and Plaintiff's healthcare providers were unable to associate the injuries sustained by Plaintiff with Plaintiff's Ozempic use before it was too late.

297. Defendants knew or should have known that the Plaintiff, Plaintiff's healthcare providers, and the general medical community did not have the ability to determine the true facts which were intentionally and/or negligently concealed and misrepresented by Defendants.

298. Plaintiff and Plaintiff's healthcare providers would not have used or prescribed Ozempic/Semaglutide had the true facts not been concealed by the Defendant.

299. Defendants had sole access to many of the material facts concerning the defective nature of Ozempic/Semaglutide and its propensity to cause serious and dangerous side effects including NAION.

300. At the time Plaintiff was prescribed and administered Ozempic, Plaintiff and Plaintiff's healthcare providers were unaware of Defendant's negligent misrepresentations, commissions and omissions.

301. Defendants failed to exercise ordinary care in making representations concerning Ozempic while they were involved in their manufacture, design, sale, testing, quality assurance, quality control, promotion, sponsoring, warranting, marketing, labeling, and distribution in interstate commerce, because the Defendant negligently misrepresented Ozempic's risk of unreasonable and dangerous adverse side effects.

302. Plaintiff and Plaintiff's healthcare providers reasonably and justifiably relied upon the misrepresentations, commissions, and omissions made by Defendants, where the concealed and misrepresented facts were critical to understanding the true dangers inherent in the use of the Ozempic/Semaglutide.

303. Plaintiff and Plaintiff's healthcare providers' reliance on the foregoing misrepresentations, commissions and omissions was the direct and proximate cause of Plaintiff's injuries, damages and losses.

304. As a direct and proximate result of reliance upon Defendants' negligent misrepresentations, jointly and/or severally, including the inadequate warnings, lack of information, lack of adequate testing and research, and the defective and dangerous nature of Ozempic/Semaglutide, Plaintiff has suffered severe personal bodily injuries and resulting pain and suffering, including: NAION (Nonarteritic Anterior Ischemic Optic Neuropathy), sudden

onset vision loss with permanent optic nerve damage/injury and swelling, field of vision loss, peripheral vision loss, disability, restrictions, interference with activities of daily living, mental anguish, emotional distress, loss of enjoyment of life, expenses of medical care and treatment, loss of earnings, loss of earning capacity and other economic losses, embarrassment, humiliation, whereby said injuries and losses are continuing and most likely permanent in nature, and Plaintiff will suffer the injuries and losses in the future.

305. As a direct and proximate result of Defendants' conduct, jointly and/or severally, Plaintiff Michael Dilworth:

(a) has been, and may in the future be, prevented from attending to his usual/customary duties, responsibilities, interests, vocations and avocations, with economic loss, loss of earnings;

(b) has been and will continue to have medical procedures and treatments, with risks, hazards, pain, suffering, humiliation, embarrassment and economic loss; and

(c) has/will be required to expend money for medicines and medical care, to treat these injuries.

WHEREFORE, Plaintiff demands judgment in his favor and against the Defendants, jointly and severally, in an amount in excess of $150,000, plus interest, costs, punitive damages, and such other relief as this Court deems just and proper.

COUNT VI
BREACH OF EXPRESS WARRANTY
Plaintiff Michael Dilworth v. Defendants

306. Plaintiff incorporates by reference the foregoing paragraphs as though fully set forth herein.

307. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, sponsoring, warranting, and/or promoting Ozempic/Semaglutides and placed them into the stream of commerce in a defective and unreasonably dangerous condition, whereby these actions were under the ultimate control and supervision of Defendants.

308. Defendants, as the holder of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

309. Defendants expressly warranted to Plaintiff, Plaintiff's healthcare providers, and the general public, by and through Defendants and/or their authorized agents or sales representatives, in publications, labeling, the internet, and other communications intended for physicians, patients, Plaintiff, and the general public, that Ozempic was safe, effective, fit and proper for its intended uses and foreseeable uses.

310. Ozempic and Semaglutide materially failed to conform to those representations made by Defendant, in package inserts and otherwise, concerning the properties and effects of Ozempic, which Plaintiff purchased and injected in direct or indirect reliance upon these express representations and warranties, whereby such failures by Defendant constituted a material breach of express warranties made, directly or indirectly, to Plaintiff concerning Ozempic sold to Plaintiff.

311. Defendants expressly warranted that Ozempic/Semaglutide was safe and well tolerated, but Defendants did not have adequate proof upon which to base such representations, and, in fact, knew or should have known that Ozempic was particularly dangerous to the well-being of Plaintiff and Plaintiff's vision and optic nerves.

312. Ozempic does not conform to those express representations because it is defective, not safe, and has serious adverse side effects.

313. Plaintiff and Plaintiff's physicians justifiably relied on Defendants' representations regarding the safety of Ozempic/Semaglutide, and Defendants' representations became part of the basis of the bargain.

314. Plaintiff and Plaintiff's healthcare providers justifiably relied on Defendants' representations that Ozempic and Semaglutides were safe and well-tolerated in their decision to ultimately prescribe, purchase and use the drug.

315. Plaintiff's healthcare providers justifiably relied on Defendant's representations through Defendants' marketing and sales representatives in deciding to prescribe Ozempic over other alternative treatments on the market, and Plaintiff justifiably relied on Defendants' representations in deciding to purchase and use the drug.

316. Plaintiff purchased and used Ozempic without knowing that the drug is not safe and well-tolerated, but that Ozempic instead causes significant and irreparable vision loss and optic nerve damage including NAION.

317. As a direct and proximate result of Defendants' breach of express warranties, jointly and/or severally, Plaintiff has suffered severe personal bodily injuries and resulting pain and suffering, including:  NAION (Nonarteritic Anterior Ischemic Optic Neuropathy), sudden onset vision loss with permanent optic nerve damage/injury and swelling, field of vision loss, peripheral vision loss, disability, restrictions, interference with activities of daily living, mental anguish, emotional distress, loss of enjoyment of life, expenses of medical care and treatment, loss of earnings, loss of earning capacity and other economic losses, embarrassment, humiliation,

whereby said injuries and losses are continuing and most likely permanent in nature, and Plaintiff will suffer the injuries and losses in the future.

318. As a direct and proximate result of Defendants' conduct, jointly and/or severally, Plaintiff Michael Dilworth:

(a) has been, and may in the future be, prevented from attending to his usual/customary duties, responsibilities, interests, vocations and avocations, with economic loss, loss of earnings;

(b) has been and will continue to have medical procedures and treatments, with risks, hazards, pain, suffering, humiliation, embarrassment and economic loss; and

(c) has/will be required to expend money for medicines and medical care, to treat these injuries.

WHEREFORE, Plaintiff demands judgment in his favor and against the Defendants, jointly and severally, in an amount in excess of $150,000, plus interest, costs, punitive damages, and such other relief as this Court deems just and proper.

COUNT VII
BREAK OF IMPLIED WARRANTY
Plaintiff Michael Dilworth v. Defendants

319. Plaintiff fully incorporates by reference the preceding paragraphs herein.

320. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic, and placed it into the stream of commerce in a defective and unreasonably dangerous condition, thereby said actions were under the ultimate control and supervision of Defendants.

321. Defendant, as the holder of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

322. Defendant was the seller of Ozempic and marketed, advertised, promoted and/or sold Ozempic to be taken for treatment of type 2 diabetes and reasonably foreseeable use of weight loss.

323. When Ozempic was prescribed by Plaintiff's physician and taken by Plaintiff, the product was being prescribed and used for an ordinary purpose and/or reasonably foreseeable purpose for which it was intended.

324. Defendants impliedly warranted their product, which they manufactured and/or distributed and sold, and which Plaintiff purchased and used, to be of merchantable quality and fit for the common, ordinary, intended and reasonably foreseeable uses for which the product was sold.

325. Defendants breached their implied warranties of the Ozempic product because the Ozempic sold to Plaintiff was not fit for its ordinary purpose to help with weight loss.

326. Ozempic would not pass without objection in the trade; it is not of fair average quality; it is not fit for its ordinary purposes for which the product is used; was not adequately contained, packaged and labeled; and failed to conform to the promises or affirmations of fact made on the container or label.

327 Defendants' breach of their implied warranties resulted in use of the unreasonably dangerous and a defective product by Plaintiff, which placed Plaintiff's health and safety at risk and resulted in the damages set forth above and herein.

WHEREFORE, Plaintiff demands judgment in his favor and against the Defendants, jointly and severally, in an amount in excess of $150,000, plus interest, costs, punitive damages, and such other relief as this Court deems just and proper.

<u>COUNT VIII</u>
<u>VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER</u>
<u>PROTECTION LAW (73 P.S. §201-1 ET SEQ.)</u>
<u>Plaintiff Michael Dilworth v. Defendants</u>

328. Plaintiff incorporates by reference the preceding paragraphs as fully set forth herein.

329. At all times pertinent hereto, Defendants were in the business of providing goods to consumers, including the drug medication Ozempic, for personal purposes and/or household purposes.

330. Plaintiff Michael Dilworth was a purchaser and consumer of Defendant Defendants' goods, Ozempic, for personal purposes.

331. Defendants acted in contravention of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL), 73 P.A. §201-1– 201-9, by affirmatively and/or expressly:

(a)causing a likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

(b)representing that Ozempic had sponsorship, approval, characteristics, ingredients, uses, benefits or qualities that they do not have;

(c)representing that Ozempic was of a particular standard, quality, or grade, when it was of another;

(d)engaging in deceptive conduct which created a likelihood of confusion or of misunderstanding;

(e)false advertising;[58] and/or

(f)failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to, or after the purchase of goods or services.
332. Specifically, Defendants, jointly and/or severally, acted in contravention of the UTPCPL, engaged in deceptive conduct which created a likelihood of confusion or misunderstanding and/or caused a likelihood of confusion or misunderstanding as to the

---

[58] For example, see https://www.fda.gov/media/191387/download?attachment.

source/sponsorship/approval or certification of goods and/or represented that goods had

sponsorship/approval/characteristics/uses/benefits/qualities that they do not have and/or

represented that goods were of a particular standard/quality/grade where they were of another,

when Defendants have deceptively made written promises/guarantees/warranties to Plaintiff

including:

(1) misrepresenting the safety profile of Ozempic/Semaglutide;

(2) omitting material risk information;

(3) failing to disclose known or knowable adverse effects regarding NAION and sudden onset vision loss due to optic nerve injury/NAION;

(4) promoting the drug in a manner likely to mislead reasonable consumers and physicians, and which did mislead Plaintiff and his Physician;

(5) Failing to disclose that Semaglutide/Ozempic increases the risk of sudden, irreversible vision loss, including NAION, caused by impaired blood flow to the optic nerve;

(6) Defendants' marketing and promotional materials failed to instruct prescribing physicians and patients to monitor for early warning signs of optic nerve injury, visual field defects, and failed to recommend prompt discontinuation or urgent ophthalmologic evaluation upon onset of such symptoms;

(7) Failing to disclose that there are multiple reports of "optic ischemic neuropathy in connection with the use of GLP-1 RAs and Ozempic/Semaglutide; and

(8) Withholding from consumers and Plaintiff, adverse drug experiences and unreported Ozempic side effects and deaths, including as to NAION/sudden onset optic nerve injury.[59]

---

[59] For example, see See, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/novo-nordisk-inc-717576-03052026 and https://www.forbes.com/sites/martinadilicosa/2026/03/10/fda-warns-novo-nordisk-over-potential-unreported-ozempic-side-effects-deaths/

333. Defendants' conduct, including its written promises, guarantees, and advertisements, had the tendency and/or capacity to deceive consumers and Plaintiff.

334. Plaintiff justifiably relied on said deceptive conduct and/or conduct which had the tendency and/or capacity to deceive consumers and Plaintiff, which did deceive Plaintiff, including the written guarantees and/or warranties, and/or false advertisements of Defendants when he purchased the Ozempic sold by Defendants.

335. Had Defendants adequately disclosed the risk of NAION and associated symptoms, Plaintiff and Plaintiff's physician would have declined to use Ozempic/Semaglutide and selected an alternative therapy.

336. As a result of the deceptive conduct of Defendants in violation of the UTPCPL upon which Plaintiff relied, Plaintiff has incurred/suffered damages, economic damages, financial damages, and losses.

337. Had Defendants not made affirmative misrepresentations, material omissions, and engaged in the deceptive conduct described herein, Plaintiff would not have purchased Ozempic and would not have incurred damages.

338. Despite knowing the falsity and misleading nature of their claims, Defendants Also engaged in unconscionable commercial practices, deception, fraud, false promise, misrepresentation and/or the knowing concealment, suppression or omission of material facts relative to the safety and efficacy of Ozempic/Semaglutide.

339. Defendants intended such actions to mislead patients, healthcare providers, and the general public with respect to the safety and efficacy of Ozempic and Semaglutides.

340. Such actions did, in fact, mislead Plaintiff, and other patients, healthcare providers, and the general public with respect to the safety and efficacy of Ozempic and Semaglutides.

341. Defendants' deceptive, unconscionable, or fraudulent representations and material omissions to patients, physicians and consumers, including Plaintiff Michael Dilworth constituted unfair and deceptive acts and trade practices in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. Sect. 201-1, *et seq*.

342. As a direct and proximate result of Defendant's conduct, including deceptive and/or unfair trade practices, the inadequate warnings, dilution or lack of information, lack of adequate testing and research, and the defective and dangerous nature of Ozempic/Semaglutide, Michael Dilworth has suffered severe personal bodily injuries and resulting pain and suffering, including: NAION (Nonarteritic Anterior Ischemic Optic Neuropathy), sudden onset vision loss with permanent optic nerve damage/injury and swelling, field of vision loss, peripheral vision loss, disability, restrictions, interference with activities of daily living, mental anguish, emotional distress, loss of enjoyment of life, expenses of medical care and treatment, loss of earnings, loss of earning capacity and other economic losses, embarrassment, humiliation, whereby said injuries and losses are continuing and most likely permanent in nature, and Plaintiff will suffer the injuries and losses in the future.

WHEREFORE, Plaintiff Michael Dilworth demands judgment against Defendants, jointly and severally, in an amount in excess of $150,000, together with treble damages, attorney fees, costs and such other relief under the UTPCPL as the Court may deem just and proper.

## COUNT IX
## PUNITIVE DAMAGES
## Plaintiff Michael Dilworth v. Defendants

343. Plaintiff fully incorporates by reference the preceding paragraphs herein.

344. The acts, commissions, and omissions of Defendants described herein consisted of oppression, fraud, and/or malice, and were done with advance knowledge, conscious disregard of and/or reckless indifference to the safety of others, and/or ratification by Defendants' officers, directors, and/or managing agents.

345. Defendants' actions amounted to actual malice or reckless indifference to the likelihood of harm associated with their acts and omissions.

346, The imposition of punitive damages is warranted here where Defendants acted in conscious disregard and/or reckless indifference to the rights and safety of consumers and Plaintiff including as follows:

(a) Defendants aggressively marketed, warranted and sold Ozempic to Plaintiff and other consumers throughout the United States despite their knowledge that Ozempic/Semaglutide can cause the problems, particularly including NAION and sudden onset optic nerve injury, as set forth in this Complaint, thereby causing the severe and debilitating injuries suffered by Plaintiff as set forth herein;

(b) Defendants recklessly misled both the medical community and the public, including Plaintiff and his physicians, by making false representations about the safety and effectiveness of Ozempic and by failing to provide adequate instructions concerning its use;

(c) Defendants recklessly withheld and did not report adverse events including serious injury and deaths regarding the use of Ozempic/Semaglutide;

(d) Defendants purposefully downplayed/understated/disregarded their knowledge of serious and permanent side effects and risks associated with Ozempic/Semaglutide despite available information demonstrating that drug could cause NAION and irreversible vision loss;

(e) Defendants were or should have been in possession of evidence demonstrating that Ozempic use could cause NAION and irreversible vision loss; and, nevertheless, Defendants continue to market, distribute and sell Ozempic by providing false and misleading information with regard to safety and effectiveness in reckless indifference to the rights, safety and health of consumers;

(f) Defendants continually/repeatedly refused to provide warnings that would have dissuaded health care professionals from using Ozempic, thus preventing health care professionals, including Plaintiff's prescribing physician, and consumers, including Plaintiff, from weighing the true risks against the benefits of using Ozempic;

(g) Defendants refused to place risk of NAION and/or Optic Nerve Injury on its Semaglutide labeling 14 or more times, i.e., when it labeled and re-labeld its Semaglutide/Ozempic product to consumers while knowing said risk and concealing/withholding/not reporting adverse events; and

(h) Defendants recklessly chose to put profits over the safety of consumers and Plaintiff.

347. It was foreseeable to Defendants that their withholding/failing to warn/refusing to disclose to consumers and prescribing physicians that Ozempic/Semaglutide can cause NAION and permanent optic nerve injury and that it had possession of adverse events involving same would cause consumers, and Plaintiff, to suffer NAION and optic nerve injury as a result of using Ozempic.

348. As a proximate result of Defendant's acts, commissions, and omissions, Plaintiff was diagnosed with NAION and suffers from irreparable vision loss due to Plaintiff's use of Ozempic.

349. As a result of Plaintiff's injuries, Plaintiff has endured substantial pain and suffering, has incurred expenses for medical care, has lost his job/career, and will remain economically challenged and emotionally harmed.

350. Plaintiff has suffered and will continue to suffer economic loss, including loss of earnings and earning capacity, and has otherwise been emotionally and economically injured.

351. Defendant has engaged in conduct entitling Plaintiff to an award of punitive damages pursuant to Common Law principles.

352. Defendant's actions were performed willfully, intentionally, and with reckless disregard and/or reckless indifference for the rights and safety of Plaintiff and the public.

353. Plaintiff's injuries and damages are severe and likely permanent.

354. Defendant's conduct was committed with knowing, conscious, deliberate

disregard for, and/or reckless indifference to, the rights and safety of consumers, including

Plaintiff, thereby warranting punitive damages in an amount appropriate to punish the Defendant

and deter them from similar conduct in the future.

355.  Defendants had an appreciation of the risk of harm to which Plaintiff was exposed

and Defendants acted, in conscious disregard of, and/or reckless indifference to, that risk.

356. The above-referenced actions by Defendants were reckless, outrageous, egregious

and/ or wanton, and said actions justify an award of punitive damages against Defendant.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally,

for injuries and compensatory damages, for punitive damages in an as yet unliquidated sum, in

excess of $150,000.00, and for costs and such other relief as this Court deems just and proper.

RESPECFULLY SUBMITTED,

Dated: 3/30/2026                BY:   _____
David E. Schreiber, Esquire
Attorney I.D.#72907
WOLPERT SCHREIBER MCDONNELL P.C.
527 Main Street, Royersford, PA  19468
(610) 792-3304 (Phone)
(610) 792-3306 (Fax)
Email: david@wsm.law
Attorneys for Plaintiff Michael Dilworth

<u>DEMAND FOR JURY TRIAL</u>

WHEREFORE, Plaintiff requests a trial by jury on all appropriate claims for relief as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Dated: 3/30/2026          BY:    _____

David E. Schreiber, Esquire
Attorney I.D.#72907
WOLPERT SCHREIBER MCDONNELL P.C.
527 Main Street, Royersford, PA  19468
(610) 792-3304 (Phone)
(610) 792-3306 (Fax)
Email: david@wsm.law
Attorneys for Plaintiff Michael Dilworth